UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RHONDA SWINNEY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 06-cv-644-JPG ) |
| ILLINOIS STATE POLICE, | ) ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter comes before the Court on the motion for summary judgment filed by defendant Illinois State Police ("ISP") (Doc. 28). Plaintiff Rhonda Swinney ("Swinney") has responded to the motion (Doc. 33) and the ISP has replied to that response (Doc. 36). In this case, Swinney alleges that ISP retaliated against her for complaining about sexual harassment in violation of Title VII of the Civil Rights Act (Count I), discriminated against her because of a disability in violation of the Americans With Disabilities Act (Count II) and retaliated against her for taking a medical leave in violation of the Family and Medical Leave Act (Count III). Swinney concedes in her response that the ISP is entitled to summary judgment on Counts II and III. Accordingly, the Court will grant the ISP summary judgment on those counts and will only address Count I in this order.

**I.  Standard for Summary Judgment**

Summary judgment is appropriate where "the pleadings, the discovery and disclosed materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most

favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, No. 06-4125, 2008 WL 746842, at *4 (7th Cir. Mar. 21, 2008); *Spath*, 211 F.3d at 396. This standard is applied with special scrutiny in cases, such as employment discrimination cases, that often turn on issues of intent and credibility. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e)(2); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas*, 209 F.3d at 692. Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *accord Michas*, 209 F.3d at 692.

## II.     Facts

Taken in the light most favorable to Swinney, the evidence establishes the following relevant facts.

Swinney, a woman, worked as an office coordinator in the ISP's Metro-East Forensic

Science Laboratory ("Lab") beginning in February 2000. In late 2002, Swinney began learning how to perform "fiscal duties" from Mary Laurent, the ISP employee charged with that responsibility. Fiscal duties included, for example, preparing vouchers for the payment of bills and invoices, preparing travel vouchers, working with the Lab's budget and transferring funds. Swinney took over the fiscal duties in January 2003 when Laurent left the office and continued to perform some other clerical functions, although most of her clerical duties were assumed by coworkers.

In January 2003, Steve Avedisian ("Avedisian") became the Lab's director, and shortly thereafter noticed deficiencies in Swinney's performance of her fiscal duties. Originally he attributed them to her being new to those responsibilities. However, she continued to perform the fiscal duties poorly six months later, even after further training from the ISP's central office in Springfield. She was also untimely in completing some of her other clerical duties and at one point failed to process lease payments for the Lab's facility.

In August 2003, Sandra Robinson (f/k/a Sandra Carpenter; "Robinson") was transferred to the Lab and became Swinney's supervisor. She controlled Swinney's work assignments. Robinson was trained to perform the fiscal duties, and recognized Swinney's errors in the performance of those duties. Swinney and Robinson started as good friends, but their relationship soured as they worked together.

During October 2003, Robinson used her work computer to distribute several e-mails containing four jokes and four pictures containing sexual references. Avedisian received at least one of the e-mails, which prompted him to tell Robinson sending such materials was not proper at work on work equipment and to ask her to stop. Robinson did not send any more

3

inappropriate e-mails.

Beginning in November 2003, Avedisian and Robinson began telling Swinney repeatedly that there would be consequences if she did not get her work done on time and that they had the power to fire her. They also gave her large, unreasonable amounts of work.[1]

In early 2004, Swinney requested approval to work a four-day work week during the summer months. Avedisian denied the request because the employee performing the fiscal duties needed to be at work every day, five days a week.

Shortly after Avedisian denied her scheduling request, on February 23, 2004, Swinney reported to Forensic Services Bureau Chief Arlene Hall, Avedisian's supervisor, that since the denial of her request to change her schedule, Robinson had been harassing and intimidating her.[2] She complained that Robinson was picking on her for things other supervisors did not address with their subordinates, such as the use of time and clerical errors. She also believed Robinson was attempting to intimidate her by the e-mails she had sent the previous October. Specifically, she told Hall she thought the pictures were offensive because they were of "men in disgustingly

---

[1] Swinney gives varying versions about when this conduct began. For example, in her answers to interrogatories, she states that the harassing conduct started in November 2003 (Resp. to Interrog. 15(c)), that it did not begin until she requested a flexible work schedule in early 2004 (Resp. to Interrog. 15(f) & (h)) and that it began the last year of her employment (Resp. to Interrog. 14(a)). In her deposition she states the harassing conduct began in the spring of 2004 (Swinney Dep. 21). She states elsewhere that she was given large amounts of work starting after she requested a flexible schedule in early 2004 (Resp. to Interrog. 15(f) & (h)), starting in May 2004 (Resp. to Interrog. 16(d)) and starting in the spring of 2005 (Resp. to Interrog. 14(c)).

[2] In her response to the summary judgment motion, Swinney cites her own deposition numerous times but fails to attach the deposition to that response. The Court accepts as true the representations made in Swinney's brief about the contents of her deposition.

compromising positions" that should never be sent to any woman.³ She also complained that her four-day work week request was denied. Hall did not believe Swinney was reporting sexual harassment – that is, harassment because of Swinney's gender. In response to Swinney's complaints, Hall determined that Avedisian had already remedied the situation shortly after Robinson had sent the e-mails months earlier. Robinson did not learn of Swinney's complaint until after Swinney left the ISP.

After her complaint to Hall, Swinney's supervisors continued to complain of her work and make demands that she work harder. Swinney's 2003 annual review and its attached memoranda, completed in March 2004, reflected she needed improvement in her use of time, but also reflected that she met her employer's expectations in all other respects. Her clerical errors were noted, although the review states she was improving.

In May 2004, the Lab's primary fiscal duties were reassigned to Robinson, and other clerical duties were redistributed among office employees. Swinney received a disproportionately large share of the clerical duties. Soon after the duties were transferred, Avedisian approved a four-day work week for Swinney. At that time, Swinney also began taking intermittent medical leave under the FMLA for her asthma. When Lab employees were out of the office on such leave, coworkers were expected to assist with the tasks assigned to the absent worker. However, when Swinney was out, her work was allowed to pile up on her desk.

Despite having her preferred work schedule, fewer fiscal duties and the medical leave she

---

³The photographs depicted the following: a man dressed as a box of tampons, a fully clothed man with a fake sheep attached at its hindquarters to his groin area, a man dressed as a priest with a fake child with its face in the man's groin area and a man dressed in a costume covered with fake penises.

required to care for her health, Swinney remained deficient in her job performance for the next several months. Additionally, in November 2004, she left work early without authorization and was given an oral reprimand.

Beginning around November 2004[4], Avedisian called Swinney into his office every day and warned that she would lose her job if she did not start working harder even though she was assigned the most time-consuming duties in the clerical area, was assigned more tasks than her coworkers, had an unreasonable workload and was working as hard as she could already. Actually, with respect to the work done for one particular colleague, Dwayne Abrams, Swinney made fewer clerical errors than a coworker. At some point, Avedisian forced Swinney to stop taking breaks, including lunch breaks, because she was not meeting deadlines. On occasion, Robinson would yell at Swinney.

In December 2004, Swinney was relieved of the duty of preparing vouchers, but she continued to fail to meet ISP's expectations through 2005 and was relieved of even more duties. Swinney's 2004 annual review, completed in March 2005, reflected that she needed improvement in four of the eight performance areas. The document indicated her clerical errors continued, but noted she no longer had voucher responsibilities. In the spring of 2005, Swinney's coworker was told not to assist Swinney with her work.

In May 2005, Swinney gave Robinson a document saying she was on medication that caused dizziness and Robinson forced her to do standing work anyway. As a result, Swinney fell and injured her back. In September 2005, Swinney left work early again without authorization

---

[4]Despite her earlier statements about harassing conduct beginning in November 2003, early/spring 2004 or spring 2005, Swinney states that this conduct occurred during "the last year Plaintiff worked." Resp. to Interrog. 14(a).

and received a written reprimand.

On September 19, 2005, Swinney reported to Hall that a coworker was looking at her in an inappropriate way and asked to file a sexual harassment complaint. Hall initiated the complaint process and pointed Swinney to the sexual harassment policy that explained the complaint process, and Avedisian instructed the coworker to have no further contact with Swinney. In October 2005, Swinney received an oral reprimand for unsatisfactory work performance. Swinney took disability leave for mental health reasons beginning November 11, 2005, and has not returned to work since then.

In August 2006, Swinney timely filed this lawsuit. As noted above, the only remaining claim is for retaliation for complaining to in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a) (Count I).

**III.     Analysis**

Title VII prohibits discrimination on the basis of sex: "It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). It also prohibits retaliation for reporting sex discrimination: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

To establish a retaliation claim under Title VII, a plaintiff may use a direct method or an

7

indirect, burden-shifting method. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007); *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 559 (7th Cir. 2004); *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004); *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Swinney relies only on the direct method to make her case.

Under the direct method, the plaintiff must present evidence that (1) he engaged in a statutorily protected activity, (2) the employer took an adverse action, and (3) there was a causal connection between the two. *Boumehdi*, 489 F.3d at 792; *Rhodes*, 359 F.3d at 508; *Stone*, 281 F.3d at 644. Under this method, "a plaintiff may offer circumstantial evidence of intentional retaliation, including evidence of suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Boumehdi*, 489 F.3d at 792 (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)).

Swinney alleges that ISP retaliated against her after she complained to Hall in February 2004 about Robinson's e-mails by giving her unwarranted discipline, harassing her, assigning her a disproportionate amount of work and refusing to reasonably modify her work schedule. The ISP contends that Swinney did not engage in protected activity when she reported Robinson's e-mails to Hall and that there was no causal connection between her reports and the alleged retaliatory action.

    A.    <u>Protected Activity</u>

For a complaint to an employer to be protected by Title VII, the complaint must indicate the alleged discrimination occurred because of the plaintiff's protected status – in this case, her

8

gender. *See Kodl v. Board of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 563 (7th Cir. 2007). Complaining of mistreatment without indicating it was because of a protected class or providing facts from which the employer could make such an inference is not protected and will not support a retaliation claim. *Id.*; *see, e.g., Tomanovich v. City of Indianapolis*, 457 F.3d 656, 664 (7th Cir. 2006) (holding complaint regarding "issues of harassment" without indication that harassment was based on sex or sexual harassment were not protected activity).

In this case, there is nothing from which a reasonable jury could infer Swinney was complaining in February 2004 that she was sexually harassed or mistreated because of her gender when she talked to Hall. The majority of Swinney's complaints were run-of-the-mill complaints any employee may have about her supervisor regardless of either's gender, i.e., she criticizes my work more than other supervisors, complains about my use of time, and she didn't approve my requested work schedule. It is true that the e-mails Hall had sent the previous fall made sexual references and were subjectively offensive to Swinney. However, there is no indication Swinney believed or communicated to Hall or anyone else at the ISP that she believed she was sent the e-mails because of her gender or that the e-mails were sexually harassing. In fact, Hall's report indicates Swinney was *not* complaining of sexual harassment. In light of this evidence, no reasonable jury could find Swinney's February 2004 complaint protected by Title VII.

B. Causal Connection

There is no evidence from which a reasonable jury could find a causal connection between Swinney's February 2004 and September 2005 complaints to Hall and any conduct by the ISP or Swinney's supervisors. Again, Swinney alleges in her complaint that ISP retaliated

9

against her after she complained to Hall in February 2004 about Robinson's e-mails by giving her unwarranted discipline, harassing her, assigning her a disproportionate amount of work and refusing to reasonably modify her work schedule. She asserts that after her complaint to Hall in February 2004, her work environment became tortuous. It appears she also believes retaliation followed her September 2005 complaint to Hall as well. Swinney relies solely on temporal proximity to establish a causal connection.

A telling temporal sequence alone may establish a causal relationship. *Clark Co. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (*per curiam*); *Sweeney v. West*, 149 F.3d 550, 557 (7th Cir. 1998); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 793 (7th Cir. 2007) ("suspiciously short period of time between the employee's complaint and the adverse employment action" may establish causal relationship). However, to establish a causal connection merely by temporal proximity, the employer's adverse action must follow "fairly soon" after or be "very close" to the employee's protected conduct." *Breeden*, 532 U.S. at 273; *Fyfe v. City of Fort Wayne*, 241 F.3d 597, 603 (7th Cir. 2001) (18-month interval between expression and adverse employment action does not show causation); *Sweeney*, 149 F.3d at 557 (nearly three years insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (four months insufficient); *Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992) (six months insufficient); *compare Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1314-15 (7th Cir. 1989) (one week sufficient); *Johnson v. Sullivan*, 945 F.2d 976, 980 (7th Cir. 1991) (one day sufficient).

Pre-existing offensive conduct is not necessarily the death knell of a retaliation claim. However, where the conduct began before the protected activity, to show a causal connection a

plaintiff must show the conduct ratcheted up or increased after the protected activity, *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 793 (7th Cir. 2007).

As for refusing to modify her work schedule, Avedisian refused to allow Swinney to work four-day weeks *before* she complained to Hall. The refusal to modify her schedule could not therefore have been *because of* her complaint.

With respect to the increase in Swinney's workload, Robinson was the person responsible for such assignments. However, Robinson did not know at the time of her alleged retaliation – and did not find out until after Swinney left the ISP – that Swinney had ever complained to Hall. A supervisor cannot retaliate if she did not know of the protected activity. *Hayes v. Potter*, 310 F.3d 979, 982-83 (7th Cir. 2002).

As for the harassment and unwarranted discipline, there is no evidence from which a reasonable jury could find that they began "very close" after Swinney's February 2004 complaint to Hall. Because of her varying versions of when this conduct began, it is difficult to say whether the reason for this is because the conduct began prior to February 2004 (as Swinney stated her answer to interrogatory 15(c) and in her February 2004 complaint to Hall) or because it began long after her complaint in November 2004 (as Swinney stated her answers to interrogatory 14(a)) or because her placement of the timing in relation is keyed to her request for a flexible work schedule, not her complaint to Hall (as Swinney stated in her answer to interrogatory 15(f) & (h)) or because her assessment that the conduct began in the spring of 2004 (as Swinney stated in her deposition at 21) is simply too vague to find the "suspiciously short period of time" necessary to infer a causal connection or too inconsistent with her other testimony and documentary evidence of the substance of her February 2004 complaint to Hall to

11

provide a reasonable basis for a jury finding.

As for Swinney's September 2005 complaint to Hall, that complaint followed the bulk of the alleged retaliation and did not result in its increase so could not have been caused by it. The only possible retaliatory act subsequent to the September 2005 complaint is Swinney's October 2005 discipline for unsatisfactory work performance, a charge she does not dispute. Because the discipline followed several weeks after her complaint to Hall and because there is no evidence the discipline was unwarranted, no reasonable jury could find it was because of Swinney's second complaint to Hall.

While it may be true that Robinson or Avedisian wanted to get rid of Swinney by overloading her with work and making her life miserable when she failed to do it all, there is simply no evidence to connect it to any activity protected under Title VII. Absent such a connection, Title VII provides no remedy.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** ISP's motion for summary judgment (Doc. 28) on all of Swinney's claims and **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATED: June 9, 2008**

                                                  s/ J. Phil Gilbert
                                                  **J. PHIL GILBERT**
                                                  **DISTRICT JUDGE**